THE STATE OF OHIO, APPELLEE, *v*. PRADE, APPELLANT.

[Cite as *State v. Prade*, 126 Ohio St.3d 27, 2010-Ohio-1842.]

*Criminal procedure — Postconviction DNA testing — R.C. 2953.74 — Prior test not definitive — Remand to determine whether new test would be outcome-determinative.*

(No. 2009-0605 — Submitted December 16, 2009 — Decided May 4, 2010.)

APPEAL from the Court of Appeals for Summit County, No. 24296, 2009-Ohio-704.

_____

SYLLABUS OF THE COURT

A prior DNA test is not "definitive" within the meaning of R.C. 2953.74(A) when a new DNA testing method can detect information that could not be detected by the prior DNA test.

_____

LUNDBERG STRATTON, J.

{¶ 1} Today this court must decide whether a prior DNA test is "definitive" within the meaning of R.C. 2953.74(A) when a new DNA testing method can detect information that could not be detected by the prior DNA test. Because we hold that defendant's prior DNA tests were not "definitive" within the meaning of R.C. 2953.74(A), we reverse the judgment of the court of appeals, but we remand the cause to the trial court to consider whether new DNA testing would be "outcome determinative" pursuant to R.C. 2953.74(B) and 2953.71(L).

**Facts and Procedural Posture**

{¶ 2} In 1997, Dr. Margo Prade was shot and killed in her van while parked outside of her medical office in Akron, Ohio. Her ex-husband, Akron

Police Captain Douglas Prade, defendant-appellant, was tried and convicted for her murder and sentenced to life in prison.

{¶ 3} The key physical evidence at trial was the bite mark that the killer made on Dr. Prade's arm through her lab coat and blouse. One of the state's experts testified that the bite mark was "consistent with" defendant's teeth but concluded that "there's just not enough to say one way or the other" that it was defendant's. The state's other expert testified that the mark "was made by Captain Prade." A defense expert opined that defendant's loose dentures meant that "the act of biting for Mr. Prade, is a virtual impossibility."

{¶ 4} The state also offered testimony from two eyewitnesses. One testified that he saw defendant near the murder scene before the murder, but also testified that although he learned of the murder the day it occurred, he came forward nine months later after months of press coverage that had featured defendant's photo. The other eyewitness testified that he was standing in the parking lot when he heard the possible killer's car "peeling off," and although he "didn't pay it no attention" and did not identify anyone in his first two police interviews, he later identified defendant as the man inside the car during his third interview. The defendant also called an alibi witness, who testified that she saw defendant exercising at roughly the time of the murder.

{¶ 5} The trial court sentenced defendant to life in prison, and the Court of Appeals for Summit County affirmed his convictions on appeal. *State v. Prade* (2000), 139 Ohio App.3d 676, 745 N.E.2d 475. This court declined discretionary review. *State v. Prade* (2000), 90 Ohio St.3d 1490, 739 N.E.2d 816.

{¶ 6} In 2004, defendant filed an application for postconviction DNA testing pursuant to R.C. 2953.71. The trial court denied the application, concluding that defendant did not qualify for DNA testing, because R.C. 2953.74(A) precludes postconviction DNA testing when "a prior definitive DNA test has been conducted." The trial court also determined that DNA evidence had

been introduced at defendant's trial and excluded defendant as the source of the DNA samples taken from the victim. The court of appeals dismissed defendant's appeal as untimely. *State v. Prade*, 9th Dist. No. 22718.

{¶ 7} In 2008, defendant filed a second application for postconviction DNA testing. The trial court denied his second application, concluding again that defendant did not qualify for postconviction DNA testing because prior definitive DNA testing had been conducted. In addition, the trial court further determined that defendant failed to show that additional DNA testing would be outcome-determinative, as required by R.C. 2953.74(B), because the prior DNA testing had excluded defendant as a source of the DNA tested for trial and other evidence at trial supported his convictions.

{¶ 8} The court of appeals affirmed the trial court judgment. The cause is now before this court pursuant to the acceptance of a discretionary appeal.

### Analysis

{¶ 9} The General Assembly enacted Ohio's DNA testing statutes in 2003 and has amended them twice since then. 2003 Sub.S.B. No. 11, 150 Ohio Laws, Part IV, 6498; 2004 Sub.H.B. No. 525, 150 Ohio Laws, Part IV, 6262; and 2006 Sub.S.B. No. 262.[1] R.C. 2953.71 through 2953.84 governs postconviction DNA testing. At issue here is R.C. 2953.74, concerning the effect of prior tests:

{¶ 10} "(A) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code and a *prior definitive DNA test* has been conducted regarding the same biological evidence that the inmate seeks to have tested, the court shall reject the inmate's application. If an eligible inmate files an application for DNA testing and a prior inconclusive DNA test has been

---

1. The General Assembly has enacted 2010 Sub.S.B. No. 77, which amends Ohio's postconviction DNA testing laws and now provides a definition for the phrase "definitive DNA test," which is very similar to the definition established by this court. However, the recent amendments do not apply to our decision today, as this appeal predates the passage of this bill and concerns the definition of the law that existed at the time of the trial court's decision.

conducted regarding the same biological evidence that the inmate seeks to have tested, the court shall review the application and has the discretion, on a case-by-case basis, to either accept or reject the application. * * *

{¶ 11} "(B) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if one of the following applies:

{¶ 12} "* * *

{¶ 13} "(2) The inmate had a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate and is requesting the DNA testing regarding the same biological evidence that the inmate seeks to have tested, *the test was not a prior definitive DNA test* that is subject to division (A) of this section, *and* the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section *would have been outcome determinative at the trial stage in that case*." (Emphasis added.)

{¶ 14} The trial court denied defendant's renewed motion for postconviction DNA testing pursuant to the statute, concluding that a "prior definitive test" had already been performed. Moreover, the court concluded that even if it could further consider defendant's petition, the petition would fail under R.C. 2953.74(B) because an exclusion result would only duplicate the result at trial and would not be outcome-determinative. The court of appeals agreed with the trial court's analysis of whether the first test was definitive. 2009-Ohio-704, 2009 WL 388217, ¶ 13. However, although initially concluding that the issue whether the new DNA test would have been outcome-determinative was moot, ¶ 15, the court went on to comment that it failed to see how yet another DNA exclusion would have been outcome-determinative at the trial.

*Prior Definitive or Inconclusive DNA Test*

4

{¶ **15**} The phrase "definitive DNA test" in R.C. 2953.74 is not defined. The court of appeals used a dictionary definition of the word "definitive": " 'serving to provide a final solution or to end a situation.' " 2009-Ohio-704, ¶ 8, quoting Merriam-Webster's Collegiate Dictionary (11th Ed.2004) 327. Both the trial and appellate courts concluded that the prior DNA testing in this case was definitive because it excluded defendant. Id. at ¶ 13. We disagree with the conclusion that the prior test was definitive.

{¶ **16**} At defendant's trial in 1998, there were several pieces of biological evidence tested for DNA, including (1) Dr. Prade's fingernail clippings, (2) a bite mark left on the fabric of the lab coat Dr. Prade was wearing when she was murdered, and (3) a broken, bloodstained bracelet.

{¶ **17**} Of that evidence, the most significant was the fabric on the victim's lab coat over the bite mark. The state's DNA testing expert agreed that the victim's lab coat over the bite mark on Dr. Prade's arm was "the best possible source of DNA evidence as to her killer's identity." During the attack, Dr. Prade apparently tried to defend herself by using her arm to push the killer away. The killer bit her arm through two layers of clothing—her lab coat and her blouse—and left a bite mark on her arm.

{¶ **18**} The testing done on the samples at issue back in 1998 was polymerase chain reaction testing ("PCR"). In 1998, Dr. Thomas Callaghan of the FBI testified that PCR testing had been available for over ten years and was the basis for many diagnostic tests. Dr. Callaghan tested some cuttings of cloth from the lab coat that Dr. Prade was wearing at the time of her death. One of the cuttings came from the bite mark that was on the sleeve in the biceps area. Dr. Callaghan testified that he analyzed the bite mark in three samples—the right side, the left side, and the center of the bite mark—because if the biter's tongue came into contact with the area, some skin cells from the biter's lips or tongue may have been left on the fabric of the lab coat. However, Callaghan also

testified that due to the amount of Dr. Prade's blood on her lab coat, the DNA from Dr. Prade's blood overwhelmed or diluted the DNA from the biter's skin cells. Dr. Callaghan testified that although DNA other than Dr. Prade's would have been important in identifying the killer, the bite mark showed only Dr. Prade's DNA.

{¶ 19} Because defendant was excluded as a contributor to the DNA that was typed in this case, the lower courts concluded that the prior DNA tests done in 1998 were definitive. However, the only information that the DNA testing on the lab coat revealed was that Dr. Prade's blood was present on her lab coat. The state's expert agreed that the 1998 DNA "test results [did] not give [him] any information about the killer" and that "the bite mark show[ed] [him] Margo Prade's DNA only." Therefore, the testing excluded defendant only in the sense that the DNA *found* was not his, because it was the victim's. But the "exclusion" excluded everyone other than the victim in that the victim's DNA overwhelmed the killer's DNA due to the limitations of the 1998 testing methods. Therefore, the exclusion was meaningless, and the test cannot be deemed to have been definitive.

*New DNA Testing Methods*

{¶ 20} Since 1998, DNA testing has advanced so far that "a DNA profile may now be developed from items which were previously unsuccessfully typed or potentially not attempted due to the compromised or limited nature of the sample," according to one of the expert witnesses. The PCR DNA testing used in this case in 1998 has been largely replaced by two newer technologies – short tandem repeat (or STR) testing and Y-chromosome STR (or Y-STR) testing.

{¶ 21} One of the difficulties with the older DNA testing methods was that, as seen in the tests conducted on Dr. Prade's lab coat over the killer's bite mark in 1998, if there was a substantial quantity of the victim's DNA present, it might overwhelm and prevent detection of the perpetrator's DNA. As an expert

explained in an affidavit, "Y-STR testing avoids this problem, because it detects only the male Y-chromosome on the swab, thus ignoring the overwhelming percentage of female DNA present that may otherwise 'drown out' the male perpetrator's DNA profile."

{¶ 22} When asked to provide an opinion on the value of Y-STR testing on the possible bite mark from Dr. Prade's lab coat, the DNA quality assurance administrator from the Ohio Attorney General's Office, Ohio Bureau of Criminal Identification and Investigation, stated: "If the lab coat cutting contains a bite mark, it is not unexpected that the DNA tests used in 1998 failed to detect DNA from the biter. When testing mixtures of DNA from two people, it is possible to resolve the different contributors so long as they are present in relatively equal proportions. If the minor component falls much below about one tenth of the total, it will not be detected. It has been my experience that trace amounts of DNA are particularly unlikely to be detected when they occur on an item which contains blood, as blood is a very rich source of DNA. * * * More recently, Y-STR tests that detect DNA found only in males have become available. In casework, I routinely see where Y-STR testing can resolve the minor male component in mixtures containing an overwhelming amount of female DNA. * * * I believe that Y-STR testing has the potential to identify any male DNA that might be contained within the lab coat bite mark sample."

{¶ 23} Thus, new DNA testing methods are now able to provide new information that was not able to be detected at the time of defendant's trial. We hold that a prior DNA test is not "definitive" within the meaning of R.C. 2953.74(A) when a new DNA testing method can detect information that could not be detected by the prior DNA test.

*Outcome-determinative*

{¶ 24} In addition to being required to show that prior DNA testing done at the trial stage was not a prior definitive DNA test, the inmate  must show that

the DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the defendant's case *would have been outcome-determinative at the trial in that case.* R.C. 2953.74(B)(2).

{¶ 25} R.C. 2953.71 provides that "outcome determinative" means that "had the results of DNA testing of the subject inmate been presented at the trial of the subject inmate requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the inmate is an eligible inmate and is requesting the DNA testing or for which the inmate is requesting the DNA testing under section 2953.82 of the Revised Code, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the inmate's case as described in division (D) of section 2953.74 of the Revised Code, *there is a strong probability that no reasonable factfinder would have found the inmate guilty of that offense * * *.*" (Emphasis added.) R.C. 2953.71(L).

{¶ 26} After finding that the prior testing in this case was definitive, the trial court stated that defendant's application for DNA testing also failed under R.C. 2953.74(B) because new testing would not be outcome-determinative. However, the overall focus of the trial court's opinion was on the issue of the definitiveness of the DNA testing introduced at trial, and because of that focus, the court gave minimal consideration to analyzing whether a new test would be outcome-determinative.

{¶ 27} In reviewing whether a new test would be outcome-determinative, the appellate court initially stated that the issue was moot, 2009-Ohio-704, ¶15, but then stated in the next paragraph of the opinion that defendant's assignment of error on the issue was overruled, id. at ¶ 16, thus appearing to affirm the judgment of the trial court on the issue. The appellate court's overall focus in the appeal was very similar to the focus of the trial court – the appellate court's analysis concentrated on whether the previous testing was definitive and then dealt with

whether new testing would be outcome-determinative in a limited manner that made no attempt to engage in any concerted application of the statutes relevant to that issue. Like the trial court, the appellate court approached outcome-determinativeness from the perspective that the previous testing was definitive.

{¶ 28} Neither court below considered R.C. 2953.74(B) and 2953.71(L) in detail because they each resolved the issue of definitiveness against the inmate – an issue that must be decided in an inmate's favor before the question of whether additional testing would be outcome-determinative has any relevance. Because we reverse on the issue of the definitiveness of the prior testing, the trial court must be given the opportunity to consider outcome-determinativeness in detail as the statutes envision. Therefore, rather than applying R.C. 2953.74(B)(2) and 2953.71(L) at this point in the case, we remand the cause to the trial court for that court to consider whether the new DNA testing would be outcome-determinative. The trial court should consider the issue in light of our conclusion that the prior testing was not definitive but should now focus on the express requirements of those statutes for outcome-determinativeness.

## Conclusion

{¶ 29} We do not have before us the issue of whether to allow new DNA testing in cases in which a prior DNA test provided a match or otherwise provided meaningful information and the inmate is simply asking for a new test using the latest testing methods. Rather, our holding is limited to situations in which advances in DNA testing have made it possible to learn information about DNA evidence that could not even be detected at the earlier trial. "[I]t was partially the development of Y-STR technology that prompted the General Assembly to enact R.C. 2953.71 through 2953.83 in order to allow otherwise qualified inmates the opportunity to take advantage of advances in technology that were not available at the time of their trials." *State v. Emerick*, 170 Ohio App.3d 647, 2007-Ohio-1334, 868 N.E.2d 742, ¶18.

**{¶ 30}** Because we hold that a prior DNA test is not "definitive" within the meaning of R.C. 2953.74(A) when a new DNA testing method can detect information that could not be detected by the prior DNA test, the DNA testing completed at the time of defendant's trial in 1998 was not a "prior definitive test" within the meaning of the postconviction DNA testing statutes. Accordingly, we reverse the judgment of the court of appeals and remand the cause to the trial court to consider whether new DNA testing would be outcome-determinative.

Judgment reversed

and cause remanded.

PFEIFER, LANZINGER, and CUPP, JJ., concur.

DELANEY and O'DONNELL, JJ., dissent.

BROWN, C.J., not participating.

PATRICIA A. DELANEY, J., of the Fifth Appellate District, sitting for O'CONNOR, J.

_____

**O'DONNELL, J., dissenting.**

**{¶ 31}** I respectfully dissent.

**{¶ 32}** In 1998, a jury convicted Douglas Prade of the murder of his ex-wife, Dr. Margo Prade. At trial, the prosecution presented evidence of a bite mark on Dr. Prade's arm that the killer made by biting through her lab coat and blouse. DNA testing of biological evidence found on the lab coat identified only Dr. Prade's DNA.

**{¶ 33}** In 2004, Prade applied for postconviction DNA testing of the biological evidence offered at trial, including the part of the lab coat that had covered the bite mark. However, the trial court concluded that R.C. 2953.74(A) barred retesting of the DNA on the lab coat because a prior definitive DNA test had been conducted, and that test excluded Prade as the source of the DNA. Prade failed to timely appeal that decision.

10

**{¶ 34}** In 2008, Prade filed a second application for DNA testing, contending that advances in testing technology permitted the discovery and identification of any DNA that Dr. Prade's killer may have left on the lab coat. The trial court once again rejected his application on the basis that a prior definitive test had been conducted on this evidence and that the test had definitively excluded Prade as the source of that DNA. The court of appeals affirmed the denial of another DNA test on the lab coat, and Prade appealed that decision to this court.

**{¶ 35}** At issue in this appeal is whether the General Assembly intended for courts to consider technological advancements in DNA testing in determining whether a prior definitive DNA test has been conducted on the same biological evidence.

**{¶ 36}** R.C. 2953.74(A) provides: "If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code and a prior definitive DNA test has been conducted regarding the same biological evidence that the inmate seeks to have tested, the court shall reject the inmate's application."

**{¶ 37}** This case presents a straightforward question of statutory construction. As we explained in *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, 863 N.E.2d 124, in construing statutes, " 'our paramount concern is the legislative intent in enacting the statute.' Furthermore, '[i]n determining this intent, we first review the statutory language, reading words and phrases in context and construing them according to the rules of grammar and common usage.' " (Citation omitted.) Id. at ¶ 29, quoting *State ex rel. Steele v. Morrissey,* 103 Ohio St.3d 355, 2004-Ohio-4960, 815 N.E.2d 1107, ¶ 21.

**{¶ 38}** Here, the General Assembly has not defined the word "definitive" for purposes of postconviction DNA testing. Thus, as we stated in *State v.*

*Anthony*, 96 Ohio St.3d 173, 2002-Ohio-4008, 772 N.E.2d 1167, ¶ 11, an undefined term in a statute "must be given its plain and ordinary meaning."

{¶ 39} According to Webster's Third New International Dictionary (1986) 592, the word "definitive" means "serving to supply a final answer, solution, or evaluation and to end an unsettled unresolved condition." Accordingly, for purposes of R.C. 2953.74(A), a definitive DNA test is one that supplies a final answer in identifying the biological evidence tested.

{¶ 40} Notably, neither the plain meaning of the word "definitive" nor any other provision of the postconviction DNA testing statute authorizes the trial court to consider advances in testing technology to determine whether prior DNA tests were definitive. Moreover, if trial courts began to consider advances in testing technology, no test would ever be considered definitive, because the standards would continue to evolve and never reveal a final result. The finality of a conviction could therefore be undermined each time a new method of examination or technological advance occurred, even if the biological evidence had already been the subject of multiple postconviction DNA examinations. The General Assembly intended to preserve final judgments and never provided for the constant reexamination of DNA samples based on scientific advances.

{¶ 41} This construction of the statute is supported by the narrow remedy afforded inmates in seeking postconviction relief. As this court explained in *State v. Steffen* (1994), 70 Ohio St.3d 399, 410, 639 N.E.2d 67, postconviction review is not a constitutional right, and it provides only "a narrow remedy." Because of the significant societal interest in the finality of judgments, the postconviction-relief statute provides only a limited opportunity to collaterally attack a conviction, an opportunity not intended to allow inmates to relitigate issues previously resolved at trial. See id. (explaining that res judicata applies to actions for postconviction relief); *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 47 (noting that courts construe statutes establishing

postconviction relief narrowly to uphold the societal interest in final judgments). As we stated in *State v. Szefcyk* (1996), 77 Ohio St.3d 93, 671 N.E.2d 233: " ' "[P]ublic policy dictates that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest, and that matters once tried shall be considered forever settled as between the parties." ' " Id. at 95, quoting *Federated Dept. Stores, Inc. v. Moitie* (1981), 452 U.S. 394, 401, 101 S.Ct. 2424, 69 L.Ed.2d 103, quoting *Baldwin v. Iowa State Traveling Men's Assn.* (1931), 283 U.S. 522, 525, 51 S.Ct. 517, 75 L.Ed. 1244.

{¶ 42} This court should treat an inmate's postconviction application for DNA testing no differently. Notably, in *District Attorney's Office for Third Judicial Dist. v. Osborne* (2009), ___ U.S. ___, 129 S.Ct. 2308, 2323, 174 L.Ed.2d 38, the Supreme Court of the United States declined to recognize a freestanding constitutional right to postconviction DNA testing. The court explained that any due process right of access to DNA evidence "must be analyzed in light of the fact that [the inmate] has already been found guilty at a fair trial, and has only a limited interest in postconviction relief," id. at 2320, and it recognized that resolving the dilemma of "how to harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice" is a "task [that] belongs primarily to the legislature," id. at 2316.

{¶ 43} In enacting R.C. 2953.71 et seq., the General Assembly took up this task, considered the public-policy questions raised by postconviction DNA testing, measured an inmate's interest in proving actual innocence against the societal interest in the finality of judgments, and established a limited remedy affording postconviction DNA testing in cases where biological evidence has not been the subject of a prior definitive test. This court should not expand that remedy beyond the statute's express terms. The legislature could have provided for courts to consider advances in testing technology in determining whether prior tests were definitive, yet it chose not to do so. Instead, by barring applications for

retesting when there has been a prior *definitive* test, the legislature signaled its intent to uphold the finality of convictions.

{¶ 44} As the trial court found, the prior DNA test definitively identified the biological evidence as belonging to Dr. Prade and as excluding Douglas Prade as a source. Thus, this is not a case in which DNA tests were performed that produced no valid and scientifically reliable result. Rather, the polymerase chain reaction tests performed before trial supplied a final answer as to the source of the DNA found on Dr. Prade's lab coat, and Prade had a full and fair opportunity to challenge any of the shortcomings of this DNA testing technique at trial.

{¶ 45} Because R.C. 2953.74 makes no provision for technological advancements in defining what constitutes a prior definitive test, and because the prior DNA tests were therefore definitive, Prade is barred from applying for postconviction DNA testing.

{¶ 46} For these reasons, I would abide by the General Assembly's resolution of the competing public-policy concerns at issue here and hold that a prior DNA test may be considered definitive notwithstanding the development of new DNA testing techniques. Accordingly, I would affirm the decision of the court of appeals.

DELANEY, J., concurs in the foregoing opinion.

_____

Sherri Bevan Walsh, Summit County Prosecuting Attorney, and Richard S. Kasay, Assistant Prosecuting Attorney, for appellee.

Jones Day, David Booth Alden, and Ann Netzel; and Ohio Innocence Project, Mark A. Godsey, and David M. Laing, for appellant.

Paul, Weiss, Rifkind, Wharton & Garrison, L.L.P., and Michele Hirshman, urging reversal for amicus curiae, The Innocence Network.

_____