[Cite as *State v. Nieves*, 2017-Ohio-5627.]

STATE OF OHIO       )
                   )ss:
COUNTY OF LORAIN   )

IN THE COURT OF APPEALS
NINTH JUDICIAL DISTRICT

STATE OF OHIO

    Appellee

    v.

MANUEL NIEVES

    Appellant

C.A. No.     16CA011006

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    04CR065988

DECISION AND JOURNAL ENTRY

Dated: June 30, 2017

CALLAHAN, Judge.

{¶1}    Defendant-Appellant, Manuel Nieves, appeals from the judgment of the Lorain County Court of Common Pleas, rejecting his application for additional DNA testing. This Court affirms.

I.

{¶2}    This is the third time this matter has come before the Court. In 2004, Mr. Nieves was indicted in connection with the murder of Sam Walls. Mr. Walls was at home with his girlfriend and their children when two masked men broke in, demanding money and drugs. One of the men was carrying a sawed-off shotgun and used it to beat Mr. Walls. That same man later shot and killed Mr. Walls before fleeing with his masked companion. Although Mr. Walls' girlfriend never saw the faces of the masked men, she believed that their voices sounded Hispanic. She also was able to observe that both men were around 5'10" tall, but only the gunman was heavyset.

{¶3} Based on the information they received from Mr. Walls' girlfriend and other sources, the police identified a man named Jose Rosado as a person of interest. At the time, Mr. Rosado was dating a young woman whose family lived nearby the victim. Through information provided by the woman's younger brother, Angel Vargas, the police learned that Mr. Rosado had broken into the victim's house along with Mr. Nieves. The police also learned that Mr. Nieves and Mr. Rosado had fled the area and might have been staying at a hotel in Sandusky. The police arrested the two men outside the hotel just over a day after the murder. Meanwhile, inside Mr. Vargas' bedroom, they found a bag containing bloody clothing, bloody shoes, and a pair of batting gloves that they believed were used during the course of the murder. Mr. Vargas also later led the police to the shotgun that had been used to kill Mr. Walls. Several members of Mr. Vargas' family and Mr. Vargas testified that they either saw Mr. Nieves with the shotgun the evening of the murder or heard him confess to killing Mr. Walls.

{¶4} A three-judge panel ultimately found Mr. Nieves guilty of the felony murder of Mr. Walls as well as aggravated burglary, kidnapping, aggravated robbery, and a number of other charges. Mr. Nieves was sentenced to 35 years to life in prison, and this Court affirmed his convictions on direct appeal. *See State v. Nieves*, 9th Dist. Lorain No. 08CA009500, 2009-Ohio-6374. In doing so, this Court rejected Mr. Nieves' argument that he was wrongly convicted because the weight of the evidence showed that it was Mr. Vargas who perpetrated these crimes alongside Mr. Rosado. This Court noted that a forensic analyst had tested the batting gloves used during the commission of the crimes and had found only two DNA profiles within an area that tested positive for blood: "a major profile consistent with the victim's DNA, and a minor profile consistent with [Mr.] Nieves' DNA." *Id.* at ¶ 15.

{¶5} In December 2014, Mr. Nieves filed an application for further DNA testing. Specifically, he sought to have tested "[a] pair of batting gloves used in the commission of the crimes, shoes and clothing from the crime." Mr. Nieves claimed that further testing would support his claim of actual innocence because it would show the presence of Mr. Vargas' DNA on the items and help prove that Mr. Vargas was the perpetrator. The court gave the State until January 30, 2015, to respond to Mr. Nieves' application, but the State never responded.

{¶6} In March 2015, Mr. Nieves asked the court to proceed to judgment on his application, given the State's failure to respond. The State then requested an extension of time to file a response, and the trial court granted a brief extension. Following its receipt of the State's response, the court denied Mr. Nieves' application for further testing. The court found that DNA testing had already been performed and the results had shown that Mr. Nieves could not be excluded as the source of DNA found on the batting gloves. Because Mr. Nieves already had a prior definitive DNA test and the court could not order Mr. Vargas, a third party, to undergo DNA testing, the court rejected Mr. Nieves' application.

{¶7} Mr. Nieves appealed from the trial court's denial of his application, and this Court reversed and remanded the matter for further proceedings. *See State v. Nieves*, 9th Dist. Lorain No. 15CA010763, 2016-Ohio-5090. In doing so, this Court noted that the DNA testing statutes require a trial court to clearly identify its basis for the denial of an application for testing. *Id.* at ¶ 8. Because the trial court had addressed the batting gloves Mr. Nieves sought to have tested, but not the shoes or clothing from the crime, this Court remanded the matter "to the trial court to clarify its basis as to the rejection of the application for DNA testing of the shoes and clothing * * *." *Id.*

{¶8}    On remand, the trial court issued a second judgment entry.  The court reiterated that it was rejecting Mr. Nieves' request to test the batting gloves because a prior definitive test had been performed and, in any event, the results of further testing would not be outcome determinative.  As to the clothing and shoes, the court found that a DNA exclusion result for Mr. Nieves or an inclusion result for Mr. Vargas, even if obtained, would not have been outcome determinative at the trial stage.  The court noted that the State had offered "compelling evidence" linking Mr. Nieves to the murder as well as expert testimony that explained why Mr. Nieves' or Mr. Vargas' DNA might or might not have been left on the gloves, shoes, or the clothing.  Consequently, the court rejected Mr. Nieves' application.

{¶9}    Mr. Nieves now appeals from the trial court's denial of his application for further DNA testing and raises three assignments of error for this Court's review.

II.

## ASSIGNMENT OF ERROR NO. 1

TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR DNA TESTING IN VIOLATION OF THE RIGHT TO DUE PROCESS CONTAINED IN THE OHIO AND U.S. CONSTITUTIONS AS APPELLANT IS INNOCENT OF THE CRIME S (sic) FOR WHICH HE HAS BEEN CONVICTED[.]

{¶10}   In his first assignment of error, Mr. Nieves argues that the trial court erred when it rejected his application for further DNA testing.  He argues that he never received a prior definitive DNA test on the inside of the batting gloves, the shoes, or the clothing from the crime scene and that those test results would have changed the outcome at his trial.  This Court does not agree that the trial court erred when it denied Mr. Nieves' application.

{¶11}   "If an eligible offender submits an application for DNA testing * * *, the court shall make the determination as to whether the application should be accepted or rejected."  R.C.

2953.73(D). The court must reject the application if "a prior definitive DNA test has been conducted regarding the same biological evidence that the offender seeks to have tested * * *." R.C. 2953.74(A). A "definitive DNA test" is one "that clearly establishes that biological material from the perpetrator of the crime was recovered from the crime scene and also clearly establishes whether or not the biological material is that of the eligible offender." R.C. 2953.71(U). A test is not definitive "if the eligible offender proves by a preponderance of the evidence that because of advances in DNA technology there is a possibility of discovering new biological material from the perpetrator that the prior DNA test may have failed to discover." *Id. Accord State v. Prade*, 126 Ohio St.3d 27, 2010-Ohio-1842, syllabus. "Prior testing may have been a prior 'definitive DNA test' as to some biological evidence but may not have been a prior 'definitive DNA test' as to other biological evidence." R.C. 2953.71(U).

{¶12} If a prior DNA test was performed, but yielded an inconclusive result "the court shall review the application and has the discretion, on a case-by-case basis, to either accept or reject the application." R.C. 2953.74(A). The court may accept the application only if it satisfies the criteria set forth in R.C. 2953.74(C) and if "the offender shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence * * * would have been outcome determinative at the trial stage * * *." R.C. 2953.74(B)(2). An "outcome determinative" result is one that, had it "been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case * * *, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense * * *." R.C. 2953.71(L).

{¶13} Through their investigation, the Lorain Police Department learned that the two men who had broken into Mr. Walls' home had worn masks, the gunman had worn gloves, and

one of the men had left a shoe imprint on Mr. Walls' front door when gaining entry. The police submitted several items to the Bureau of Criminal Identification and Investigation ("BCI") for testing, including a mask, a pair of batting gloves, three pairs of tennis shoes, and several clothing items. At trial, Martin Lewis, a trace evidence analyst, testified that he compared the sole pattern on all three tennis shoes to the impression of the shoe print found on Mr. Walls' door, but none of the shoes matched the impression. The implication, therefore, was that the police were never able to recover the pair of shoes used to break through Mr. Walls' door.

{¶14} David Niemeyer, an analyst in BCI's biology section, tested several items for the presence of blood. Items of note that he tested included the mask, the batting gloves, a pair of Nike tennis shoes, another pair of tennis shoes, and a shirt. The mask did not test positive for blood, but Mr. Niemeyer made a cutting of the mouth/nose area and forwarded it to the DNA analysts. Meanwhile, he testified that he found blood on the remaining items and swabbed those locations for further testing. With regard to the batting gloves, Mr. Niemeyer took cuttings of blood stains from the left glove as well as an area around the wrist. He identified the wrist area as the spot most likely to yield a DNA result.

{¶15} Two DNA analysts testified regarding the items that Mr. Niemeyer forwarded for additional testing. Heather Bizub tested the swabs from the second pair of tennis shoes (i.e., not the Nike shoes) and testified that she was only able to locate a partial DNA profile of limited value. Due to the limited results she obtained, she was unable to draw any conclusions about the profile. Her colleague, Melissa Zielaskiewicz, tested the remaining items.

{¶16} As to the mask, Ms. Zielaskiewicz found a mixture of DNA from at least three individuals, but the results she obtained were limited. From the limited results, she was only able to conclude that the victim was not a contributor, Mr. Nieves could not be excluded as a

contributor, and she could not draw any conclusions about whether Mr. Rosado was a contributor. As to the Nike shoes, Ms. Zielaskiewicz uncovered two DNA profiles on the outside of the shoes with the victim being the major contributor. She testified that the results from the minor profile were below BCI's reporting threshold, so she could not compare those results with anyone's DNA standard, regardless of whose she had. She further testified that she tested a swab taken from the inside of the Nike shoes and detected a mixed DNA profile from at least two unknown individuals. Ms. Zielaskiewicz confirmed that the victim, Mr. Nieves, and Mr. Rosado were all excluded as possible sources. Likewise, as to the shirt she tested she found a mixed DNA profile from at least two unknown individuals with the victim, Mr. Nieves, and Mr. Rosado being excluded as possible sources.

{¶17} As to the batting gloves, Ms. Zielaskiewicz testified that the swab from the blood on the gloves produced two DNA profiles: a major profile consistent with the victim and a minor profile consistent with Mr. Nieves. She confirmed that only those two profiles were present in that area. She also opined that it was unlikely both were blood profiles. She explained that it was more likely the blood was strictly the victim's and that Mr. Nieves' profile was present due to the fact that he had either handled or worn the gloves. As for the swab taken from the wrist portion of the gloves, Ms. Zielaskiewicz also found two DNA profiles: a major profile consistent with Mr. Nieves and a partial minor profile from an unknown individual. She stated that the minor profile could have been left by someone who had either worn or handled the gloves.

{¶18} As previously noted, Mr. Nieves sought further testing of the batting gloves as well as "shoes and clothing from the crime." Mr. Nieves did not specify which clothing or which pair of shoes he sought to have tested. Rather, the explanation portion of his application focused on the batting gloves, which he claimed to have loaned to Mr. Vargas. Mr. Nieves

asserted that "[t]he gloves and other evidence were not tested for the presence of [Mr.] Vargas' or [Mr.] Rosado's DNA to show their guilt and [his] innocence." He asserted that additional testing would show that the DNA mixtures contained Mr. Vargas' DNA. Attached to his application was an affidavit that Mr. Rosado apparently completed in 2010, in which he averred that Mr. Nieves was innocent and that he and Mr. Vargas had broken into the victim's home before Mr. Vargas had shot the victim.

{¶19} It is undisputed that for the testing done in anticipation of Mr. Nieves' trial the analysts at BCI were presented with three DNA standards: the standards from the victim, Mr. Nieves, and Mr. Rosado. The analysts were never presented with a DNA standard from Mr. Vargas, so they did not compare his DNA profile with any of the profile results they obtained. With that in mind, we turn to the trial court's rationale for rejecting Mr. Nieves' application.

{¶20} As to the batting gloves, the trial court determined that Mr. Nieves was not entitled to additional testing because he had received a prior, definitive test. *See* R.C. 2953.74(A). The court noted that Ms. Zielaskiewicz had only found two DNA profiles on the swab taken from the bloodstain on the gloves and was able to conclude that those profiles were consistent with the victim and Mr. Nieves. The court further noted that the swab from the wrist area of the glove produced a major profile that was consistent with Mr. Nieves. Because the results from the gloves "were definitive and inclusive of [Mr.] Nieves," the court concluded that he was precluded from seeking additional testing. Moreover, the court found that, even assuming Mr. Vargas' DNA could be located as a result of additional testing, that result would not be outcome determinative in light of all the other evidence introduced at trial.

{¶21} As to the clothing and the shoes that the analysts tested, the court found that Mr. Nieves had not received a prior, definitive test. Nevertheless, the court rejected his request for

additional testing. The court determined that it could not require Mr. Vargas to undergo DNA testing and, even if his DNA was found on one or more items, those results would not be outcome determinative. The court found that the State had produced "compelling evidence" that Mr. Nieves was the shooter and that Mr. Vargas' DNA, even if found, could have been attributed to his handling of the items after the murder occurred.

{¶22} Upon review, this Court questions whether Mr. Nieves received a prior, definitive DNA test in this matter. First, while analysts discovered DNA consistent with Mr. Nieves' on the batting gloves, a prior DNA test is only definitive if it "clearly establishes that biological material *from the perpetrator of the crime* was recovered from the crime scene * * *." (Emphasis added.) R.C. 2953.71(U). It is undisputed that the gloves were found in Mr. Vargas' bedroom, along with bloodied clothing and shoes. It was Mr. Nieves' position at trial that the batting gloves belonged to him, but that he loaned them to Mr. Vargas before Mr. Vargas used them to commit the murder. Under that scenario, Mr. Nieves' DNA could have been present on the gloves simply because he owned them and not because he perpetrated these crimes. Second, to the extent Mr. Nieves may have been excluded as a source of the unknown DNA found on several items, the DNA-testing statutes were amended after his trial. The statutes now permit a trial court "to order biological material from the crime scene to be compared to the combined DNA index system * * * or [] to any identified person to determine whether that person is the DNA source." *State v. Noling*, 136 Ohio St.3d 163, 2013-Ohio-1764, ¶ 35, citing R.C. 2953.74(E). While Mr. Rosado's DNA profile was tested against the DNA profiles that analysts obtained, Mr. Vargas' was not. Accordingly, for the foregoing reasons, this Court will assume for purposes of its analysis that Mr. Nieves did not have a prior, definitive DNA test.

{¶23} As previously noted, a defendant who seeks to have further DNA testing performed must establish that the results of further testing would have been and will be "outcome determinative." R.C. 2953.74(B)(2), (C)(5). The trial court determined that Mr. Nieves could not meet his burden on that point due to the "compelling evidence" that the State produced at trial. Having reviewed the record, this Court agrees with the trial court's determination.

{¶24} The victim's girlfriend was an eyewitness to the break in that occurred and testified that two masked men were responsible. She testified that both men sounded Hispanic and were approximately 5'10" tall, but, importantly, the gunman was heavyset. The State produced evidence that Mr. Nieves was 5'9" tall and Mr. Rosado was 5'10" tall, but Mr. Nieves was noticeably heavier than Mr. Rosado. The State also produced evidence that, at the time of the murder, Mr. Vargas was several years younger and smaller than both men. Mr. Vargas, his younger brother, and his older sister all testified that they saw Mr. Nieves with a shotgun on the evening of the murder and that he and Mr. Rosado walked off together directly before the murder. Mr. Vargas' younger brother testified that the two soon returned to his house and were out of breath. Meanwhile, Mr. Vargas testified that he came back home to discover that Mr. Nieves and Mr. Rosado had used his house to change clothes and had left items, including the batting gloves, there. Mr. Vargas testified that he gathered up the items that the two left, stuffed them into a garbage bag, and hid the bag in his room.

{¶25} Mr. Vargas and his older sister, who was dating Mr. Rosado at the time, both testified that Mr. Nieves confessed to shooting the victim. Mr. Vargas' sister stated that Mr. Nieves specifically asked her and his girlfriend to retrieve the shotgun and his mask. She testified that Mr. Nieves described having to drop the items over a fence while running because,

due to his weight, he could not make it over the fence. She testified that she and Mr. Nieves' girlfriend succeeded in finding the shotgun, but not the mask. Based on their information, the police later found the discarded mask behind a residence nearby the victim's house.

{¶26} Mr. Vargas' sister testified that she spent the night with Mr. Rosado, Mr. Nieves, and his girlfriend after the murder. The following morning, they learned that the police were looking for them and had removed several bags of evidence from Mr. Vargas' house. Mr. Vargas' sister testified that, at that point, the group panicked and fled to Sandusky, where they secured a hotel room. They then learned that Mr. Vargas had been arrested and decided to return. According to Mr. Vargas' sister, Mr. Nieves in particular wanted to return because he did not want Mr. Vargas to take the blame for his crimes. When they were about two blocks from home, however, Mr. Vargas' sister testified that another car stopped next to them and both Mr. Nieves and Mr. Rosado got into that car and drove away. The police spotted the second car at the Sandusky hotel and arrested both Mr. Nieves and Mr. Rosado. Their arrest occurred slightly more than 24 hours after the murder.

{¶27} As noted, the police confiscated three pairs of tennis shoes for forensic testing, but were not able to match the soles on any of the shoes to the footprint they found on the victim's front door. The State introduced, as part of its case-in-chief, certain jail calls that Mr. Nieves made after his arrest. In one of the calls, Mr. Nieves specifically asked his girlfriend whether she had "the kicks" (i.e. a pair of shoes) and instructed her to throw them away.

{¶28} An "outcome determinative" result is one that, had it "been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case * * *, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense * * *." R.C. 2953.71(L). Even assuming that additional testing

resulted in Mr. Vargas' DNA profile being found on one or more of the items that BCI tested, Mr. Nieves has not shown that there exists a strong probability that, given those results, no reasonable factfinder would have found him guilty. *See id.* Mr. Vargas acknowledged that he handled the batting gloves, shoes, and clothing when placing the items into a garbage bag, and the experts who testified at trial agreed that DNA can be transferred when someone handles an item. As the trial court aptly concluded, the State produced "compelling evidence" that Mr. Nieves perpetrated the crimes here. Because we agree that Mr. Nieves failed to satisfy the outcome determinative requirement set forth in R.C. 2953.74, we cannot conclude that the trial court erred by rejecting his application for additional testing. Thus, his first assignment of error is overruled.

### ASSIGNMENT OF ERROR NO. 2

> TRIAL COURT ERRED TO APPELLANT'S PREJUDICE WHEN HE ALLOWED THE STATE TO RESPOND TO HIS MOTION FOR DNA TESTING WELL PAST THE COURT'S IMPOSED DEADLINE AFTER APPELLANT FILED A MOTION TO PROCEED TO JUDGMENT SHOWING BIAS IN FAVOR OF THE STATE[.]

{¶29} In his second assignment of error, Mr. Nieves argues that the trial court erred when it allowed the State to file a response to his application beyond the statutory and court-imposed deadline. He argues that he was prejudiced by the court's consideration of the State's untimely response because the trial judge "blatantly utilized the State's improper response *in toto* to formulate his judgment." (Emphasis sic.) For the reasons that follow, this Court rejects his argument.

{¶30} Once an offender files an application for DNA testing, "any response to the application by the prosecuting attorney * * * shall be filed not later than forty-five days after the

date on which the eligible offender submits the application." R.C. 2953.73(C). "The prosecuting attorney * * * may, but [is] not required to, file a response to the application." *Id.*

**{¶31}** Mr. Nieves filed his application for further testing on December 16, 2014. When the State did not immediately respond, he filed a motion to proceed to judgment. The State then requested and received an extension of time to file a response. The State ultimately filed its response on March 9, 2015; 84 days after Mr. Nieves filed his application.

**{¶32}** Even assuming that the trial court lacked authority to extend the 45-day time limit contained in R.C. 2953.73(C), Mr. Nieves has not shown that he was prejudiced as a result of the court's actions. *See Princess Kim, L.L.C. v. U.S. Bank, N.A.*, 9th Dist. Summit No. 27401, 2015-Ohio-4472, ¶ 18 ("To demonstrate reversible error, an aggrieved party must demonstrate both error and resulting prejudice."). While he claims that the trial court "blatantly utilized" the State's response to formulate its opinion, the record reflects that the trial court applied the DNA testing statutes to Mr. Nieves' application and the evidence set forth at his trial. Additionally, this Court has already reviewed the trial court's decision and upheld it on its merits based on an independent review of the record. Because Mr. Nieves cannot demonstrate prejudice as a result of the trial court's decision to extend the State's response deadline, his second assignment of error is overruled.

## ASSIGNMENT OF ERROR NO. 3

> APPELLANT DID NOT HAVE HIS MOTION HEARD BY A JUDGE WHO WAS NOT PREJUDICED OR BIASED DEPRIVING HIM OF DUE PROCESS AND RESULTING IN STRUCTURAL ERROR.

**{¶33}** In his third assignment of error, Mr. Nieves argues that he was deprived of due process and structural error occurred because the trial judge who reviewed his application was biased. This Court disagrees.

{¶34} "The presence of a biased judge is structural error, which, if demonstrated, requires reversal." *State v. Cepec*, Slip Opinion No. 2016-Ohio-8076, ¶ 73.

> The term "biased" "implies a hostile feeling or spirit of ill will or undue friendship or favoritism toward one of the litigants or his attorney, with the formation of a fixed anticipatory judgment on the part of the judge, as contradistinguished from an open state of mind which will be governed by the law and the facts."

*Id.*, quoting *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463 (1956), paragraph four of the syllabus. "'[T]he threshold inquiry is whether, with reference to a range of acceptable, though not necessarily model, judicial behavior, the [trial] court's conduct falls demonstrably outside this range so as to constitute hostility or bias.'" *Cepec* at ¶ 74, quoting *McMillan v. Castro*, 405 F.3d 405, 410 (6th Cir.2005).

{¶35} Mr. Nieves argues that the trial court exhibited bias against him when it allowed the State additional time to respond to his application, reasoned that it could not order Mr. Vargas to submit to DNA testing, speculated as to why Mr. Nieves' or Mr. Vargas' DNA might or might not be present on certain items, and evoked sympathy for Mr. Vargas. As to the sympathy the court allegedly evoked for Mr. Vargas, Mr. Nieves notes that the court referred to Mr. Vargas as a "juvenile" or "young Vargas" in its entry, despite the fact that Mr. Vargas likely would have been tried as an adult, if indicted. He further notes that the court specifically cited as irony the fact that he was seeking to exculpate himself by implicating Mr. Vargas.

{¶36} Upon review, Mr. Nieves has not shown that the trial judge who reviewed his application possessed a "hostile feeling or spirit of ill will" towards him or favoritism toward the State such that the judge lacked "an open state of mind * * * governed by the law and the facts." *State ex rel. Pratt* at paragraph four of the syllabus. Although the court afforded the State additional time to respond, the court's entry, "as a whole, belies that the [judge] 'display[ed] a

deep-seated favoritism or antagonism as to make fair judgment impossible.'" *State v. Baston*, 85 Ohio St.3d 418, 428 (1999), quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994). The entry reflects that the court decided this matter based upon the evidence introduced at Mr. Nieves' trial. To the extent the court commented on Mr. Vargas' age, there is no dispute that he had not yet turned 18 when these events occurred. Moreover, to the extent the court categorized Mr. Nieves' attempt to exculpate himself by implicating Mr. Vargas as ironical, the entry reflects that the court did so due to testimony that the reason Mr. Nieves initially returned from Sandusky after the murder was because he did not want Mr. Vargas to be blamed for his crimes. Even assuming that one or more of the court's actions or comments constituted less than "model, judicial behavior," the record, when viewed in its entirety, does not support the conclusion that the trial judge was biased. *See Cepec* at ¶ 74, quoting *McMillan* at 410. *See also State v. Sanders*, 92 Ohio St.3d 245, 278-279 (2001). Accordingly, Mr. Nieves' third assignment of error is overruled.

## III.

{¶37} Mr. Nieves' assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

LYNNE S. CALLAHAN
FOR THE COURT

HENSAL, P. J.
SCHAFER, J.
CONCUR.

APPEARANCES:

MANUEL NIEVES, pro se, Appellant.

DENNIS P. WILL, Prosecuting Attorney, and ELIZABETH LINDBERG, Assistant Prosecuting Attorney, for Appellee.