OPINION
{¶ 1} Appellant Clarence Roberts appeals the decision of the Guernsey County Court of Common Pleas that denied his application for DNA testing. The following facts give rise to this appeal.
 {¶ 2} On June 30, 1997, the Guernsey County Grand Jury indicted appellant on one count of aggravated robbery, in violation of R.C. 2911.01, one count of aggravated murder, in violation of R.C. 2903.01, with a death penalty specification. The charges arose out of the robbery and stabbing death of Leo Sinnett on May 17, 1997. The matter proceeded to trial by jury on September 15, 1997.
 {¶ 3} The following evidence was adduced at trial.
 {¶ 4} On May 15, 1997, appellant, Albert "Chip" Andrews, John LaFollette, and Mia Willey traveled to Zanesville, Ohio, in appellant's white 1986 Oldsmobile Cutlas Cierra on a "drug buy". Appellant and Andrews purchased $100 worth of crack cocaine from "a black guy in Zanesville" with money borrowed from Willey. After smoking the crack, appellant and Andrews returned to the dealer's house in order to get their money back because they were not satisfied with the quality of the drugs. The dealer refused to offer a money back guarantee and the group's discussion focused on where to obtain money to buy more drugs. Andrews stated he knew somebody the group could rob. When Andrews mentioned Leo Sinnett's name, appellant suggested foregoing the robbing of Sinnett and proceeding to kill him. Andrew, LaFollette, and Willey were named as co-defendants.
 {¶ 5} On May 17, 1997, the group reconvened at Willey's house. Appellant and Andrews left to purchase beer and cigarettes. When they returned, appellant and Andrews asked LaFollette if he wanted to go for a drive. Andrews drove appellant's vehicle; appellant sat in the front passenger's seat; and LaFollette positioned himself in the back seat. Andrews drove to 12225 Lincoln Street, Buffalo, Ohio, Sinnett's residence. Appellant and LaFollette exited the car. Andrews remained in the vehicle. LaFollette walked to the front of the house to inspect some trees he had arranged to remove for Sinnett. As appellant exited the front door of Sinnett's residence, he told LaFollette, "There's no need in talking to him, he's dead." The two returned to the vehicle and the trio left the scene.
 {¶ 6} At 6:49 p.m. on the same evening, Sergeant Brian Vierstra of the Ohio State Highway Patrol observed a white Oldsmobile traveling westbound out of Buffalo on State Route 313, just past the I-77 bypass. As the vehicle approached, Sergeant Vierstra noticed the car did not have any visible front registration. When the vehicle traveled past, the officer did not observe any visible rear registration. Thereafter, Sergeant Vierstra activated his lights and pursued the vehicle, which continued westbound until the driver entered a private driveway. The driver and right front passenger exited the vehicle. The officer ordered the passenger back into the vehicle and instructed the driver to walk to the back of the car. Sergeant Vierstra observed a third male in the back seat of the vehicle.
 {¶ 7} As the officer spoke with the driver, who was identified as Andrews, Sergeant Vierstra found him to be under the influence of alcohol. When Andrews refused to submit to field sobriety tests, the officer placed him under arrest. Shortly thereafter, Trooper Stolarick arrived at the scene.
 {¶ 8} The two officers spoke with appellant, who was covered in blood from his waist to his knees. Trooper Stolarick asked appellant about the blood. Appellant informed the officers he had just processed a road kill deer. When the officers advised appellant the vehicle would be impounded, appellant told them he had a knife on his person. Sergeant Vierstra described the weapon as a four inch, double-edged knife with a black handle contained in a leather sheath.
 {¶ 9} As the officers spoke with appellant, LaFollette exited the vehicle and walked directly into a nearby residence. The officers did not observe any blood on his clothing or his person. Jim Tuttle, the owner of the house, appeared and offered to allow appellant and LaFollette to stay with him. Thereafter, Sergeant Vierstra transported Andrews to the station, while Trooper Stolarick waited for the tow truck to impound appellant's vehicle.
 {¶ 10} After leaving the scene, Trooper Stolarick contacted Deputy Masters of the Cambridge Sheriff's Department to inform the deputy he (Trooper Stolarick) was assisting that evening in overseeing the Meadowbrook High School prom goers. During their conversation, Deputy Masters received a call from his dispatcher advising of the discovery of a body. Deputy Masters and Trooper Stolarick proceeded to the Sinnett residence. Upon their arrival, the officers learned of Sinnett's stabbing death. The Trooper recalled the traffic stop he and Sergeant Vierstra made earlier that evening. Deputy Masters, Trooper Stolarick, and two other deputies did not locate anyone upon their return to the Tuttle residence.
 {¶ 11} The following day, appellant was arrested. LaFollette fled to Pennsylvania, where he was arrested approximately one month after the incident.
 {¶ 12} Special Agent Mike Kopfer of the Bureau of Criminal Identification assisted in the investigation of Sinnett's homicide. During his investigation, Agent Kopfer found blood stains on the front passenger's seat of the white Oldsmobile. The agent did not observe any other blood stains in the vehicle. Margaret Saupe, a forensic scientist with the Bureau of Criminal Identification, also examined the Oldsmobile and observed blood stains on the front passenger's seat. A DNA analysis of the blood sample indicated the blood was that of the victim. Saupe's analysis of Andrews' personal belongings, which were recovered during the investigation, revealed no traces of blood.
 {¶ 13} After LaFollette's arrest in Pennsylvania, he gave two taped statements to the Guernsey County Sheriff's Department. LaFollette's first statement was given to Detective Ron Pollock on June 18, 1997. The second was given to Detective Pollock and Detective John Davis on June 25, 1997.
 {¶ 14} At trial, appellant called LaFollette as a witness. Due to LaFollette's alignment with the State, the trial court permitted both parties latitude in their examinations of LaFollette. Attorney Tingle, appellant's trial counsel, attempted to impeach LaFollette with his prior statements. However, the trial court found the statements were not inconsistent with the witness' trial testimony and would not allow Attorney Tingle to make further inquiry into the statements LaFollette made to police. The statements were proffered into evidence.
 {¶ 15} After hearing all the evidence and deliberations, the jury found appellant guilty of aggravated robbery and aggravated murder. The jury did not recommend the death sentence. Via Judgment of Conviction dated October 6, 1997, the trial court memorialized the jury's verdicts. Via Judgment Entry of Sentence dated November 4, 1997, the trial court sentenced appellant to life imprisonment without parole for the offense of aggravated murder and a term of ten years for the offense of aggravated robbery. The trial court ordered the sentences to run consecutively.
 {¶ 16} Appellant filed a direct appeal, to this Court, which we affirmed. See State v. Roberts (Nov. 24, 1998), Guernsey App. No. 97 CA 29.
 {¶ 17} After unsuccessfully appealing his case in the Ohio state courts, Roberts filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Southern District of Ohio. The district court denied the writ. The Sixth Circuit Court of Appeals granted Roberts a certificate of appealability with respect to the following claims: (1) whether Roberts was deprived of a fair trial, a trial by jury, and due process when the trial court ordered that alternate jurors be present during deliberations; and (2) whether Roberts was deprived of the effective assistance of appellate counsel when his appellate counsel failed to raise as error the trial court's order that alternate jurors be present during deliberations. The court affirmed the district court's denial of Roberts' petition. Roberts v. Carter (6th Cir. 2003),337 F.3d 609. The United States Supreme Court denied appellant's writ of Certiorari. Roberts v. Carter (2004), 540 U.S. 1151,124 S.Ct. 1150.
 {¶ 18} On May 16, 2005, appellant filed a pro se Motion to Vacate and Reconstruct Sentence pursuant to United States v.Booker (2005), 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621, andBlakely v. Washington (2004), 542 U.S. 296, 124 S.Ct. 2531,159 L.Ed.2d 403. The trial court denied appellant's motion. In response to appellant's request for findings of fact and conclusions of law, the trial court issued those findings and conclusions on August 17, 2005. The trial court concluded that neither of Mr. Roberts' sentences exceeded the statutory maximum, and that Blakely "did not deal with the issue of consecutive sentences for multiple convictions." Judgment Entry filed August 17, 2005, at 2.
 {¶ 19} Appellant filed his appeal from the denial of his Petition to Vacate or Reconstruct Sentence. This court affirmed the trial court's decision. See, State v. Roberts, 5th
Dist. No. 2005-CA-26, 2006-Ohio-782.
 {¶ 20} Thereafter, on October 1, 2004, appellant filed an application for DNA testing. The Guernsey County Prosecuting Attorney filed a report regarding the existence of biological material available for DNA testing on December 5, 2004. On April 6, 2005 appellant was appointed counsel to pursue his application for DNA testing. The trial court denied appellant's request on December 14, 2005 concluding that: 1). R.C. 2953(C) (1) had been satisfied in that biological material was collected from the crime scene or the victim of the offense and that the material is still in existence; 2). R.C. 2953.74(C) (2) (a) was not satisfied as the testimony at appellant's trial indicated that the sample of biological material does not contain sufficient material to be extracted for a test sample; and 3). Even if there was sufficient biological material to perform DNA testing the results would not be outcome determinative because no fingerprint or hair was attributed to appellant during his trial and the testimony of the witnesses was sufficient to convict appellant even if he were excluded as the source of the hair or fingerprint.
 {¶ 21} Appellant timely filed a notice of appeal and sets forth the following assignments of error for our consideration:
 {¶ 22} "I. THE TRIAL COURT'S DENIAL OF MR. ROBERTS' APPLICATION FOR DNA TESTING IS CONTRARY TO LAW BECAUSE THE TRIAL COURT DID NOT COMPLY WITH THE REQUIREMENTS OF R.C. 2953.74(C)(4) AND (5)
 {¶ 23} "II. THE TRIAL COURT'S DENIAL OF MR. ROBERTS' APPLICATION FOR DNA TESTING IS CONTRARY TO LAW BECAUSE THE TRIAL COURT FAILED TO COMPLY WITH THE REQUIREMENTS OF R.C. 2953.76(A) AND (B)."
 I. {¶ 24} In his First Assignment of Error, appellant maintains the trial court abused its discretion and denied his right to due process of law when it found that DNA evidence would not be outcome determinative and therefore, denied his application for DNA testing. We disagree.
 {¶ 25} The procedure for reviewing and accepting DNA-test applications is set forth in R.C. 2953.71 through 2953.82. After an eligible inmate submits a DNA-test application, R.C.2953.73(D) states that the trial court "shall make the determination as to whether the application should be accepted or rejected. * * * The court shall make the determination in accordance with the criteria and procedures set forth in [R.C.] 2953.74 to 2953.81." R.C. 2953.73(D) also requires the trial court to consider the application and all corresponding and pertinent files, records, affidavits, documentary evidence, and all materials regarding the proceedings against defendant, "unless the application and the files and records show [that defendant] is not entitled to DNA testing, in which case the application may be denied." Id. Following its determination, the trial court shall enter a judgment and order that accepts or rejects the application. R.C. 2953.73(D) mandates that the trial court shall state the reasons for the acceptance or rejection, based on the criteria and procedures of R.C. 2953.71 to 2953.81, within the judgment and order.
 {¶ 26} R.C. 2953.74(B) states:
 {¶ 27} "(B) If an eligible inmate submits an application for DNA testing under section 2953.73 of the Revised Code, the court may accept the application only if one of the following applies:
 {¶ 28} "(1) The inmate did not have a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate and is requesting the DNA testing regarding the same biological evidence that the inmate seeks to have tested, the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section would have been outcome determinative at that trial stage in that case, and, at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available.
 {¶ 29} "(2) The inmate had a DNA test taken at the trial stage in the case in which the inmate was convicted of the offense for which the inmate is an eligible inmate and is requesting the DNA testing regarding the same biological evidence that the inmate seeks to have tested, the test was not a prior definitive DNA test that is subject to division (A) of this section, and the inmate shows that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject inmate's case as described in division (D) of this section would have been outcome determinative at the trial stage in that case".
 {¶ 30} Appellant's case would fall under Section (B) (1) because he did not have a DNA test taken at the trial stage. Notably, the trial court could have used this factor as an alternate ground for rejecting the application because appellant cannot meet the requirement that at the time of the trial stage in his case "DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available". We would note that in State v.Pierce (July 9, 1990), Delaware App. No. 89-CA-30, we held that DNA testing of both inclusion and exclusion is admissible pursuant to Evid.R. 702. State v. Swanson, 5th Dist. No. 05 CA 13, 2005-Ohio-5471 at ¶ 17. Additionally, The Ohio Supreme Court recognized DNA testing as generally admissible and generally accepted in State v. Pierce (1992),64 Ohio St.3d 490, 597 N.E.2d 107, when the court stated: "[Defendant] has not advanced any argument which would justify the use of a standard for the admissibility of DNA evidence different from that used in determining the admissibility of other scientific or technical evidence. DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be admissible, subject to a judicial analysis for prejudice". Id. at 497, 597 N.E.2d 107. Thus, DNA testing was found to be admissible evidence prior to appellant's trial in 1997. Further, a review of the record reveals that DNA testing was conducted upon blood samples and referred to by the State's expert with respect to the availability of such a test for samples of human hair. (T. at 1334; 1344-46; 1368-69).
 {¶ 31} Accordingly, appellant fails the third prong of the (B) (1) criteria. Therefore denial of his application was proper.State v. Swanson, supra. An appellate court shall affirm a trial court's judgment that is legally correct on other grounds, that is, one that achieves the right result for the wrong reason, because such an error is not prejudicial. Reynolds v. Budzik
(1999), 134 Ohio App.3d 844, at fn. 3, 732 N.E.2d 485, citingNewcomb v. Dredge (1957), 105 Ohio App. 417, 424, 6 O.O.2d 178,152 N.E.2d 801; State v. Payton (1997), 124 Ohio App.3d 552,557, 706 N.E.2d 842. ("It has long been the law in Ohio that `* * * where the judgment is correct, a reviewing court is not authorized to reverse such judgment merely because erroneous reasons were assigned as the basis thereof.'") Budzik, quotingAgricultural Ins. Co. v. Constantine (1944), 144 Ohio St. 275,284, 29 O.O. 426, 58 N.E.2d 658.
 {¶ 32} We further agree with the trial court's determination that the results of DNA testing on the hair and/or fingerprint would not be outcome determinative.
 {¶ 33} "R.C. 2953.74(C) contains further factors that restrict a court's ability to accept applications for DNA testing. These factors apply whether or not a prior DNA test has been performed. Some factors concern items like scientific suitability of the biological material and the chain of custody. See R.C. 2953.74(C) (1), (2), and (6). Others are substantive, and require the court to find: (1) that at the trial stage, the identity of the person who committed the crime was an issue: (2) that one or more defense theories asserted at the trial stage were such that if DNA testing is conducted and an exclusion result is obtained, the exclusion result will be outcome determinative; and (3) that exclusion results will be outcome determinative regarding the particular inmate. R.C. 2953.74(C) (3), (4), and (5). If any of the six factors listed in R.C.2953.74(C) is not satisfied, the court is precluded from accepting the application. In other words, if the court finds, for example, that the identity of the perpetrator was not at issue at trial, DNA testing will not be allowed, even if all the other criteria are satisfied. Likewise, if the court finds that the test would not be outcome determinative, the application must be rejected". State v. Hayden, 2nd Dist. No. 20747,2005-Ohio-4025 at ¶ 19.
 {¶ 34} R.C. 2953.71(L) defines "outcome determinative" to mean that if the DNA results had been presented at defendant's trial, and if the results were found to be relevant and admissible, then "no reasonable factfinder would have found [defendant] guilty of that offense." After reviewing the record, we agree with the trial court that an exclusion result from DNA testing of the human hair taken from the victim's hand would and partial fingerprint recovered at the home of the victim would not be outcome determinative of appellant's guilt.
 {¶ 35} At trial Margaret Saupe, a forensic scientist with the Ohio Bureau of Criminal Investigation, testified that several hairs were recovered from the hands of the victim. (T. at 1326). The bloody Caucasian hair found in the victim's hands came from the victim himself. (Id. at 1326-27). A small clump of animal hair was also found in the hands of the victim. (Id.). The remaining hair recovered from the victim's hands was a small human hair. (Id. at 1326). Ms. Saupe testified that that hair was microscopically examined and compared to hair samples from the appellant. She testified "I found them to be different with respect to microscopic appearance." (Id. at 1346). On cross-examination Ms. Saupe testified as follows:
 {¶ 36} "Q. . . . Did you find any hairs of Clarence Roberts, you got a control sample of his, that matched anything that was given to you that came from the victim?
 {¶ 37} "A. No.
 {¶ 38} "Q. So you can't say there's any match to Clarence Roberts?
 {¶ 39} "A. That's correct."
 {¶ 40} "Q. Were you given a control sample of a John LaFollete?
 {¶ 41} "A. I don't recall that. I don't believe so.
 {¶ 42} "Q. So you were not able to identify whether or not any of the hairs found at the scene or on the victim could be matched to John LaFollete?
 {¶ 43} "A. That's correct. I'm concerned that we keep saying matched.
 {¶ 44} "Q. Similar to.
 {¶ 45} "A. Yeah.
 {¶ 46} "Q. Is that the right language to use?
 {¶ 47} "A. Yeah, hairs just can't be identified with absolute certainty."
 {¶ 48} (T. at 1365). Ms. Saupe explained this answer on re-direct examination as follows:
 {¶ 49} "Q. Ma'am, you can never say with absolute certainty that this hair right here came from this person, is that right?
 {¶ 50} "A. Only when there's a sufficient amount of root structure for DNA.
 {¶ 51} "Q. And you didn't have that in this case?
 {¶ 52} "A. I did not."
 {¶ 53} (T. at 1368-69). Finally the testimony reveals that it would not be uncommon for a victim with blood stained hands that is found on the carpeted floor of a room to have various debris, including human hair, on his hands. (T. at 1329-30).
 {¶ 54} From the above testimony it becomes readily apparent that the human hair found in the victim's hands did not contain sufficient root structure for a DNA test and that if it had such a test would have been performed.
 {¶ 55} Sheryl Mayhan a latent fingerprint examiner with the Ohio Bureau of Criminal Investigation testified that fingerprints found in the victim's home contained insufficient ridge detail to perform a comparison. (T. at 1376-77; 1383).
 {¶ 56} Even if DNA testing excluded the appellant as the source of the hair in the hands of the victim or the fingerprint found in the home a reasonable jury could still find appellant guilty of the charges set forth in the indictment. A reasonable jury could come to this conclusion based solely upon circumstantial evidence, and testimony of the other witnesses. See State v. Roberts (Nov. 24, 1998), Guernsey App. No. 97 CA 29.
 {¶ 57} The victim was stabbed 45 times. Furthermore, two days before the crime, appellant discussed killing the victim. Additionally, on the day of the murder, appellant carried a hunting knife on his person. When stopped by the State Highway Patrol the trooper noticed "[appellant's] hands were completely red as if they were dyed in red dye . . . on the front part of his clothes from his waist area down to his knees were covered with a red substance which appeared to be blood." (T. at 976-77). Further the appellant's hunting knife was bloody and contained "a small piece what [sic.] appeared to be flesh . . ." (Id. at 977-78). Appellant explained the blood on his clothing and his knife by telling the trooper that "he had just got done gutting a deer. He asked me also that I would not mention it to the game warden." (Id. at 978). At trial appellant admitted that he lied to the trooper concerning the source of the blood. (T. at 1595-1596).
 {¶ 58} We agree that DNA analysis of the human hair sample and the fingerprint would not have changed the result of appellant's trial. The jury was clearly informed that the hair was not similar to appellant's and that it was not compared to Mr. LaFollete's. The jury was informed that no match could be made with anyone concerning the fingerprint because it did not contain sufficient detail for a comparison. If the results matched an unidentifiable third party they would not benefit appellant's theory that Mr. LaFollete killed the victim. If the hair and fingerprint belonged to Mr. LaFollete it would not exculpate appellant. It would simply establish that appellant did not leave the hair or the fingerprint that was found at the scene of the crime. There was no dispute at trial that Mr. LaFollete had been at the home of the victim on a prior occasion.
 {¶ 59} In the case sub judice, in order for the trial court to find that DNA evidence on the hair sample and fingerprint would be outcome determinative, it would have to disregard all the evidence provided at trial. A review of the record establishes that this evidence was substantial and therefore, the trial court did not abuse its discretion when the court determined that DNA testing would not be outcome determinative.
 {¶ 60} Accordingly, appellant's first assignment of error is overruled.
 II. {¶ 61} In his second assignment of error, appellant argues that the trial court erred in rejecting his application without requiring the state to prepare a report regarding the quantity and quality of the parent sample, as well as findings on the chain of custody and reliability of the sample, as mandated by R.C. 2953.76.
 {¶ 62} In light of our disposition of appellant's first assignment of error we find this question to be moot. Appellant was not eligible for DNA testing. In the alternative, as the results would not be outcome determinative any error in not ordering the report is harmless beyond a reasonable doubt.
 {¶ 63} Further we would note that the Ohio Supreme Court has accepted the following question of law for review "[m]ust a trial court read R.C. 2953.74 sequentially so that an eligible inmate seeking a DNA test must first meet the outcome determinative criteria set forth in R.C. 2953.74(B)(1) or (B)(2) before a court considers R.C. 2953.74(C) and requires a prosecutor report as provided in R.C. 2953.75?" State v. Buehler (2006),108 Ohio St.3d 1411, 841 N.E.2d 316.
 {¶ 64} Accordingly, appellant's second assignment of error is overruled.
 {¶ 65} For the forgoing reasons, the judgment of the Guernsey County Court of Common Pleas is affirmed.
By Gwin, J., Wise, P.J., and Boggins, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion, the judgment of the Guernsey County Court of Common Pleas is affirmed. Costs to appellant.