[Cite as *State v. Jordan*, 2024-Ohio-2462.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 23AP-256 (C.P.C. No. 05CR-3380) |
| v. | : | (REGULAR CALENDAR) |
| Quan Jordan, | : | |
| Defendant-Appellant. | : | |

---

D E C I S I O N

Rendered on June 27, 2024

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Sheryl L. Prichard*, for appellee.

**On brief:** *Quan Jordan*, pro se.[1]

---

APPEAL from the Franklin County Court of Common Pleas

MENTEL, P.J.

{¶ 1} Defendant-appellant, Quan Jordan, appeals from an April 4, 2022 entry denying his application for DNA testing. For the reasons that follow, we affirm.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} The facts and procedural history of this case are well established. In *State v. Jordan*, 10th Dist. No. 05AP-1330, 2006-Ohio-5208 ("*Jordan I*"), this court set out the factual basis for his underlying convictions as follows:

> On May 24, 2005, the Franklin County Grand Jury indicted appellant on the following counts involving offenses that took place on April 2, 2005, against two victims who are sisters (we will refer to the victims as "V1" and "V2"): Count 1, aggravated burglary, in violation of R.C. 2911.11; Count 2, kidnapping, in violation of R.C. 2905.01; Count 3, kidnapping, in violation of

---

[1] While counsel for Jordan initially filed an appearance on January 3, 2024, we later granted counsel's motion to withdraw as Jordan "no longer requires our services." (Apr. 25, 2024 Mot. to Withdraw.)

R.C. 2905.01; Count 4, aggravated robbery, in violation of R.C. 2911.01; Count 5, aggravated robbery, in violation of R.C. 2911.01; Count 6, rape, in violation of R.C. 2907.02; Count 7, rape, in violation of R.C. 2907.02; Count 8, rape, in violation of R.C. 2907.02; Count 9, kidnapping, in violation of R.C. 2905.01; and Count 10, aggravated robbery, in violation of R.C. 2911.01. Each count contained a firearm specification pursuant to R.C. 2941.145. The rape count in Count 6 contained a sexually violent predator specification pursuant to R.C. 2941.148, and a repeat violent offender specification pursuant to R.C. 2941.149.

Appellant pled not guilty to the charges and specifications. Appellant waived his right to a jury trial on the sexually violent predator and repeat violent offender specifications in Count 6, and, instead, appellant opted to have the trial court determine his guilt on such specifications. A jury trial ensued on the criminal offenses and firearm specifications.

In its opening instructions, the trial court instructed the jury that, "[i]n the event you hear an answer to a question and I've sustained the objection to the question, disregard the question and the answer and don't consider either for any purpose whatsoever." (Vol. I Tr. at 13.) Next, during the trial, plaintiff-appellee, the State of Ohio, called V1 to testify, and she testified to the following. During the early morning hours of April 2, 2005, V1 and V2 were moving into an apartment. V1 was at her car retrieving items when a man, later identified as appellant, offered assistance. V1 declined. During the course of events, V1 opened the apartment door, which the victims had left unlocked, and V2 asked V1 to come upstairs. V1 went upstairs and saw appellant pointing a firearm at V2. Appellant indicated that he wanted $300 and that V2 stated that she did not have any money. V1 offered to write a check, but appellant refused. Rather, appellant wanted the victims to withdraw money at a bank machine from one of their bank accounts. Appellant stated that they would go to the bank machine in V1's vehicle.

Throughout the incident, V1 noticed that appellant "tried not to touch anything. If he had to touch something * * * he would * * * pull his coat to his hands and his fingers so that he doesn't leave prints. He actually said, I don't want to leave any prints behind." (Vol. I Tr. at 37-38.)

While riding to the bank machine, appellant stated that he had been in jail for 20 years for killing someone. At the bank machine, V1 asked if appellant would accept $200 so that she would have enough money for rent. Appellant agreed, but when he saw V1's bank transaction receipt, appellant became upset and stated that V1 had lied. Appellant then stated that they were going to go back to the victims' apartment to figure out how to get the balance of the money.

At the apartment, appellant told V2 to take a shower just as she had planned when he first arrived. V2 complied, and appellant then instructed V1 to take her clothes off, and appellant placed his firearm at V1's head. Appellant forced

V1 to perform fellatio, and, during the sexual abuse, V1 spat "out onto the carpet." (Vol. I Tr. at 47.) Appellant then placed his fingers in V1's vagina, and appellant placed the tip of his penis in V1's vagina.

After V2 returned from the shower, appellant stated that they were going to return to the bank machine to get more money. Appellant stated that V1 was to drive her own vehicle and that appellant would drive V2 in his vehicle. At the bank machine, V1 withdrew $200. Next, appellant and V2 approached V1's vehicle, where appellant obtained the money and left the scene.

Subsequently, V1 drove to a gas station and called 911. Appellee played the 911 telephone call recording at trial, and the recording depicted V1 describing the events to which she had just testified. V1 also described appellant, noting that he had freckles on his face. While making the call, V1 stated that she saw appellant. However, V1 was mistaken.

V1 explained at trial why she thought she saw appellant at the gas station. According to V1, "I saw a black male kind of the same height approaching * * *. He was approaching the [gas station] and I thought it was him." (Vol. I Tr. at 71.) V1 further stated: "I was very emotional. * * * When the person came to the [gas station], I realized that it was not him." (Vol. I Tr. at 71.)

Next, V1 testified to the following. Law enforcement took V1 to the hospital, and hospital personnel collected evidence for a rape kit. Afterwards, Columbus Police Detective Kim Foster asked V1 to identify appellant in a photo array. However, V1 could not identify appellant in the photo array. V1 explained at trial, "[a]ll I knew is [appellant] had some freckles on his face. But in the pictures I could not see the freckles on anybody's face. So what I was looking for was the freckles, which I didn't see in the pictures." (Vol. I Tr. at 82.) However, at trial, V1 positively identified appellant as the man who committed the above-described offenses.

Nurse Janet Baatz examined V1 at the hospital after the sexual abuse. Nurse Baatz testified that, when she collected physical evidence from V1's mouth, "there's a chance [she] would [have] miss[ed]" physical evidence that appellant left in V1's mouth, "[b]ut typically" if such evidence is in a victim's mouth, she would obtain it. (Vol. I Tr. at 149.)

V2 testified to the following on appellee's behalf. During the evening of April 1, 2005, V2 and V1 were moving into an apartment. At the early morning hours of April 2, 2005, V2 decided to take a shower while V1 finished bringing a few more items into the apartment. While V2 entered the shower, she saw a man, later identified as appellant, move toward her with a firearm. Appellant put the firearm to V2's head. Appellant stated that he needed money, but V2 responded that she did not have any money. Appellant then told V2 to have V1 come into the apartment. V2 called for V1.

When V1 came into the apartment, appellant stated that they were going to a bank machine and were going to drive in V1's vehicle. At the bank machine, V1 asked if appellant would accept $200 so that she would have enough money for rent. Appellant agreed to accept $200, but, when appellant saw V1's transaction receipt, he became upset and stated that V1 had lied. Appellant then stated that they were going to go back to the victims' apartment to figure out how to get the balance of the money.

At the victims' apartment, appellant told the victims that he was a criminal. He then told V2 to take a shower, just as she had planned when appellant first arrived. V2 took a very brief shower and then saw appellant and V1 in the living room. Appellant was penetrating V1 with his penis. V2 then started yelling. Thereafter, appellant stated that they were going back to the bank machine. V1 drove her vehicle, and appellant drove V2 in his vehicle. While driving to the bank machine, appellant talked about his life in jail and stated that he did not care if he went back to jail. At the bank machine, appellant and V2 exited his vehicle. Appellant obtained the money from V1, and left the scene.

Next, the victims went to a gas station, and V1 called 911. Subsequently, V2 identified appellant in a photo array. Lastly, at trial, V2 testified that the photo array depicted appellant with freckles on his face.

Detective Foster testified on behalf of appellee that, after law enforcement determined that appellant committed the above-noted offenses, warrants for appellant were filed and appellant's parole officer was contacted. Appellant's trial counsel objected to such testimony, the trial court sustained the objection, and the following exchange took place:

[THE COURT]: Just go ahead and ask another question.
[APPELLEE]: Let me ask you this: At any time did you –
[APPELLANT'S TRIAL COUNSEL]: Your Honor, may we approach?
* * *
[APPELLANT'S TRIAL COUNSEL]: This is a seasoned detective, said he was on parole * * * which means he's been to prison, saying he's been to prison. Now they know he's been to prison. That's grounds for a mistrial.
[THE COURT]: Motion will be overruled. I will be happy to instruct the jury with respect to the last comment.
[APPELLANT'S TRIAL COUNSEL]: The comment has been made and I think the impact is almost impossible –
[THE COURT]: Do you want me to instruct the jury further to disregard the last comment?
[APPELLANT'S TRIAL COUNSEL]: Yeah.

(Vol. II Tr. at 242-243.) Thus, the trial court instructed the jury: "I did sustain the objection to the last question. The jury is to disregard her last comment." (Vol. II Tr. at 243-244.)

On cross-examination, Detective Foster admitted that physical evidence taken from the victims' apartment did not link to appellant. Detective Foster also admitted that the physical evidence from V1 for the rape kit did not link to appellant.

Before deliberations, the trial court dismissed the kidnapping charge in Count 9 and allowed the jury to deliberate on one kidnapping charge for V1 in Count 3 and another kidnapping charge for V2 in Count 2. As to the kidnapping charge in Count 2 pertaining to V2, the parties stipulated that appellant released V2 in a safe place unharmed, thereby making the count a second-degree felony instead of a first-degree felony pursuant to R.C. 2905.01(C).

After deliberations, the jury found appellant guilty on the remaining charges and firearm specifications. The trial court found appellant guilty on the sexually violent predator and repeat violent offender specifications in Count 6.

On November 23, 2005, the trial court later held a sentencing hearing and sentenced appellant to maximum and consecutive prison sentences. In particular, at the sentencing hearing, the trial court sentenced appellant to ten years imprisonment on the kidnapping charge in Count 2, even though the maximum prison term for the second-degree felony is eight years. See R.C. 2929.14(A)(2). The trial court also stated: "The sentences on Count One, Two and Three are going to run consecutive. Counts Four, Five and Ten are going to run concurrent with each other but consecutive with the other sentences." (Vol. III Tr. at 8.) Additionally, the trial court imposed 20 years imprisonment on the repeat violent offender specification after making particular findings under R.C. 2929.14(D)(2)(b).

Subsequently, the trial court journalized its sentence in a judgment entry, wherein the trial court reiterated that it sentenced appellant to ten years for kidnapping in Count 6, and the trial court referred to the kidnapping offense in Count 6 as a first-degree felony. The trial court also stated in the judgment entry that appellant was to serve the prison sentence for Count 6 consecutive to the other counts, and appellant was to serve the sentences in Counts 7 and 8 concurrently with each other, but consecutive to Counts 1, 2, 3, 4, 5, and 10.

*Jordan I* at ¶ 2-22.

{¶ 3} On direct appeal, this court affirmed most of Jordan's convictions but reversed the conviction and sentence for first-degree felony kidnapping finding the undisputed facts established only a second-degree felony kidnapping offense. *Jordan I* at ¶ 46. We also reversed parts of Jordan's sentence as the trial court imposed a sentence different from the one it announced at the sentencing hearing. *Jordan I* at ¶ 49-50. We

remanded the matter back to the trial court for resentencing. The trial court resentenced Jordan and imposed consecutive prison terms, which we affirmed in *State v. Jordan*, 10th Dist. No. 07AP-52, 2007-Ohio-5097 ("*Jordan II*"). In 2008, the trial court denied Jordan's petition for post-conviction relief, which we also affirmed. *State v. Jordan*, 10th Dist. No. 08AP-1074, 2009-Ohio-2161 ("*Jordan III*"). Jordan has since sought a writ of habeas corpus in federal court that was subsequently dismissed. *Jordan v. Sheets*, S.D.Ohio No. 2:10-CV-34, 2012 U.S. Dist. LEXIS 90870 (June 29, 2012) ("*Jordan IV*").

{¶ 4} On March 31, 2014, Jordan filed an application for DNA testing of a hand towel, wash mitt, and a toilet swab. The state filed a memorandum in opposition on May 5, 2014. The state later withdrew its May 5, 2014 memorandum in opposition. (March 17, 2021 Notice.) On August 17, 2021, Jordan filed a motion for a case scheduling order to set an evidentiary hearing on his application for DNA testing. On September 20, 2021, the state filed a memorandum in opposition to setting this matter for an evidentiary hearing and reasserted its prior opposition to Jordan's application for DNA testing. On April 4, 2022, the trial court denied the application concluding that DNA testing was readily available and accepted at the time of trial and testing the requested items would not be outcome determinative.

{¶ 5} On April 27, 2023, Jordan filed a motion for delayed appeal pursuant to App.R. 5(A). On May 1, 2023, the state filed a memorandum in opposition. A reply brief was filed on May 16, 2023. On July 13, 2023, we found the trial court's entry denying Jordan's application for postconviction DNA testing was a civil judgment that was not served in accordance with Civ.R. 58(B) and, therefore, App.R. 5(A) did not apply. *State v. Jordan*, 10th Dist. No. 23AP-256, 2023-Ohio-2402, ¶ 15. (July 13, 2023 Decision.) Thus, we denied Jordan's motion for leave to file a delayed appeal but, because Jordan was not served with the trial court's judgment pursuant to Civ.R. 58(B), the filing deadline under App.R. 4(A) did not run and his April 27, 2023 notice of appeal was timely. *Id.*

## II. ASSIGNMENTS OF ERROR

{¶ 6} Jordan assigns the following as trial court error:

> [I.] The trial court erred by focusing on issues reserved for a testing authority, such as testability and why items were not tested. Rather than acknowledging that D.N.A. test results that simultaneously exclude appellant and identify an alternate suspect would be outcome determinative.

[II.] The trial court erred in denying Appellant's Application for D.N.A. testing because the trial court failed to provide a reason for denying application in violation of O.R.C. § 2953.73(D). Appellant also asserts that the results of D.N.A. testing would be outcome determinative as defined in O.R.C. § 2953.71(I).

## III. LEGAL ANALYSIS

### A. Jordan's Second Assignment of Error

{¶ 7} For ease of discussion, we will address Jordan's assignments of error out of order. In Jordan's second assignment of error, he argues the trial court failed to provide a reason for denying his application in violation of R.C. 2953.73(D).[2]

### 1. R.C. 2953.71, et seq. and Standard of Review

{¶ 8} The General Assembly has established postconviction procedures for reviewing and accepting DNA applications by eligible offenders through a series of statutory enactments. *See* R.C. 2953.71 through 2953.81. R.C. 2953.73(D) directs that the trial court "shall make the determination as to whether the application should be accepted or rejected. * * * The court shall make the determination in accordance with the criteria and procedures set forth in [R.C.] 2953.74 to 2953.81." Once an inmate submits a DNA test application, R.C. 2953.73(D) requires the trial court to consider all corresponding and pertinent files, records, affidavits, documentary evidence, and all materials regarding the proceedings against the applicant, "unless the application and the files and records show the applicant is not entitled to DNA testing, in which case the application may be denied." *Id.* The trial court must resolve whether the application is accepted or rejected stating the reasons for its determination as applied to the criteria and procedures set forth in R.C. 2953.71 to 2953.81. *Id.* R.C. 2953.74(B) and (C) provide the requirements that must be met before an application can be accepted. *State v. Auerswald*, 9th Dist. No. 18CA0033-M, 2019-Ohio-1148, ¶ 8.

{¶ 9} Whether to grant or deny an application for DNA testing rests within the trial court's sound discretion, which we will not disturb absent a showing of an abuse of discretion. *State v. Galloway*, 10th Dist. No. 07AP-611, 2008-Ohio-3470, ¶ 13, citing *State v. Buehler*, 113 Ohio St.3d 114, 2007-Ohio-1246, ¶ 31. *See also State v. Caulley*, 10th Dist. No. 09AP-172, 2009-Ohio-5801, ¶ 15, citing R.C. 2953.72(D)(8), 2953.73(D), and 2953.74

---

[2] In both assignments of error, Jordan argues that the results of the DNA test would be outcome determinative. Based on the other allegations in his first assignment of error, we have analyzed whether the DNA test would prove outcome determinative in the subsequent portion of this decision.

("A common pleas court has the sole discretion, subject to appeal, to determine whether an eligible inmate's application for DNA testing satisfies the acceptance criteria set forth in R.C. 2953.74 and whether the court should accept or reject the application."). Abuse of discretion requires a showing that the trial court's determination was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). A trial court's failure to provide an explanation for denying a defendant's application under R.C. 2953.73(D) is contrary to law and amounts to an abuse of discretion. *State v. Smith*, 1st Dist. No. C-190558, 2021-Ohio-1389, ¶ 7, citing *State v. Conner*, 8th Dist. No. 108885, 2020-Ohio-4310, ¶ 14.

{¶ 10} Here, the trial court set out the appropriate statutory analysis and found that the application should be denied on multiple grounds. First, the trial court concluded that Jordan failed to demonstrate that a DNA test was not available or generally accepted at the time of trial. "If the Defendant believed that the items had evidentiary value, he could have requested that the items be tested." (Apr. 4, 2022 Entry at 2.) The trial court also found that Jordan failed to demonstrate that the DNA evidence would have been outcome determinative. The trial court went on to analogize the facts of the instant case to *State v. Wilkins*, 163 Ohio App.3d 576, 2005-Ohio-5193 (9th Dist.), *aff'd*, 113 Ohio St.3d 170, 2007-Ohio-1382. (Apr. 4, 2022 Entry at 3.) While further discussion on the topic would certainly have been welcome, the trial court's entry provided an adequate explanation in support of his denial of Jordan's application for DNA testing.

{¶ 11} Jordan's second assignment of error is overruled.

## B. Jordan's First Assignment of Error

{¶ 12} In Jordan's first assignment of error, he argues the trial court erred by focusing on issues reserved for the testing authority and finding that the results of the DNA test would not prove outcome determinative.

### 1. ANALYSIS

{¶ 13} As set forth in R.C. 2953.74(B), if an eligible offender submits an application for DNA testing under R.C. 2953.73 where there was no prior DNA testing of the item at trial, the defendant must demonstrate the following elements:

> The offender did not have a DNA test taken at the trial stage in the case in which the offender was convicted of the offense for which the offender is an eligible offender and is requesting the DNA testing regarding the same biological evidence that the offender seeks to have tested, the offender shows

that DNA exclusion when analyzed in the context of and upon consideration of all available admissible evidence related to the subject offender's case as described in division (D) of this section would have been outcome determinative at that trial stage in that case, and, at the time of the trial stage in that case, DNA testing was not generally accepted, the results of DNA testing were not generally admissible in evidence, or DNA testing was not yet available.

R.C. 2953.74(B)(1). Because R.C. 2953.74(B)(1) uses the conjunctive, we interpret this section of the statute to mean that a defendant must meet all the criteria in (B)(1). *State v. Daniels*, 5th Dist. No. 2019CA0106, 2020-Ohio-3810, ¶ 35, citing *Wilkins* at ¶ 10. If the inmate fails to meet their burden, the trial court is statutorily barred from accepting their application for DNA testing. R.C. 2953.74(B) and (C); *Caulley* at ¶ 16, citing *Buehler* at ¶ 30. As the requested items were not tested for DNA during the trial stage of this case, Jordan's application falls within the scope of R.C. 2953.74(B)(1).

{¶ 14} Upon review, we find that the trial court applied the appropriate legal standard under R.C. 2953.74. In its April 4, 2022 entry, the trial court denied Jordan's application finding that DNA testing was available at the time of Jordan's trial and a DNA test on the requested materials would not prove outcome determinative. The question becomes whether the trial court abused its discretion by denying the application for DNA testing.

### a. DNA testing was generally accepted, the results of DNA testing were generally admissible in evidence, and DNA testing was available.

{¶ 15} The trial court's denial of Jordan's motion was based in part on its finding that DNA testing was generally accepted and available at the time of trial. In his brief, Jordan contends that a Y-Chromosome Short Tandem Repeat ("Y-STR") analysis of the evidence is required as the test was relatively new in 2005. (Aug. 29, 2023 Appellant's Brief at 5.)

{¶ 16} In 1992, the Supreme Court of Ohio recognized DNA testing as generally admissible and generally accepted in *State v. Pierce*, 64 Ohio St.3d 490 (1992). The *Pierce* court wrote, "[Defendant] has not advanced any argument which would justify the use of a standard for the admissibility of DNA evidence different from that used in determining the admissibility of other scientific or technical evidence. DNA evidence may be relevant evidence which will assist the trier of fact in determining a fact in issue, and may be

admissible, subject to a judicial analysis for prejudice." *Id.* at 497.[3] Since *Pierce*, prior forms of DNA tests, such as the polymerase chain reaction test ("PCR"), have been largely replaced by two newer technologies such as short tandem repeat ("STR") testing and Y-STR testing. *State v. Prade*, 126 Ohio St.3d 27, 2010-Ohio-1842, ¶ 20. "Y-STR DNA testing is used for both sexual assault and non-sexual assault cases where mixed samples are collected from evidence. Specifically, Y-STR DNA is useful in cases where there is a small amount of male DNA that may be overwhelmed by female DNA in a mixed sample." *State v. Thornton*, 12th Dist. No. CA2012-09-063, 2013-Ohio-2394, ¶ 7, citing *Prade* at ¶ 21. Ohio courts have recognized Y-STR testing as a generally accepted form of DNA testing since 2002. *State v. Thornton* at ¶ 7, citing *State v. Metcalf*, 12th Dist. No. CA2010-12-326, 2012-Ohio-674, ¶ 16, citing *Prade* at ¶ 21-23; *see* National Institute of Justice, *U.S. Department of Justice, Special Report: Using DNA to Solve Cold Cases*, July 2002 at 5.

{¶ 17} Here, we find the trial court's conclusion that DNA testing was generally available at the time of Jordan's trial reasonable and does not amount to an abuse of discretion. Jordan's trial took place in 2005, over a decade after DNA testing was recognized as a generally accepted practice. *See State v. Madden*, 10th Dist. No. 08AP-172, 2008-Ohio-2653, ¶ 10 (finding the trial court properly denied an application for DNA testing as appellant could have had a DNA test performed at the time of his 2001 trial). Moreover, Y-STR testing was an established form of DNA testing when Jordan was tried in this case. While Y-STR testing was available in 2005, Jordan failed to seek Y-STR testing on the identified items at the time of trial. As DNA testing, particularly Y-STR testing, was generally available and accepted at the time of trial, Jordan cannot meet all of the necessary elements of R.C. 2953.74(B)(1). *Daniels* at ¶ 37 (finding appellant's application fails to meet all the requirements of R.C. 2953.74(B)(1) because DNA testing was generally admissible and generally available at the time of his trial in 2014); *Auerswald* at ¶ 9-10; *State v. Roberts*, 5th Dist. No. 2006-CA-02, 2006-Ohio-5018, ¶ 30-31.

---

[3] The Ninth District Court of Appeals examined whether DNA evidence was generally accepted and admissible prior to *Price*. *See Wilkins* at ¶ 11. The *Wilkins* court rejected the state's argument that DNA testing was generally accepted or admissible in 1987 as reflected in the Supreme Court's decision in *State v. Apanovitch*, 33 Ohio St.3d 19 (1987). "In *Apanovitch,* Justice Brown mentions the advancement and availability of DNA comparison testing in a footnote in his concurring in part and dissenting in part portion of the opinion, however nothing is cited regarding the issues of DNA comparison testing being generally accepted or generally admissible." *Wilkins* at ¶ 11.

**b. DNA Testing was Not Outcome Determinative.**

{¶ 18} The trial court also denied Jordan's application for DNA testing finding that the results would not prove outcome determinative. The General Assembly has defined "outcome determinative" as:

> that had the results of DNA testing of the subject offender been presented at the trial of the subject offender requesting DNA testing and been found relevant and admissible with respect to the felony offense for which the offender is an eligible offender and is requesting the DNA testing, and had those results been analyzed in the context of and upon consideration of all available admissible evidence related to the offender's case as described in division (D) of section 2953.74 of the Revised Code, there is a strong probability that no reasonable factfinder would have found the offender guilty of that offense * * *.

R.C. 2953.71(L).

{¶ 19} Upon consideration of the available admissible evidence related to the case, we find the trial court did not abuse its discretion by concluding that, even if a DNA test was performed, the evidence would not have proven outcome determinative.

{¶ 20} Two possibilities might occur if the identified materials were tested. The first scenario is that Jordan's DNA is not on any of the items. The second is that another unknown individual's DNA appears on the requested items. As to the former, the absence of DNA evidence would not exclude Jordan or prove outcome determinative. In fact, the lack of DNA evidence was a central theme of Jordan's defense at trial. During points of the trial and on appeal, Jordan used the lack of DNA evidence to his advantage arguing that the state did not meet his burden based on the lack of physical evidence. Jordan noted that the rape kit performed on V1 did not link him to the sexual abuse and the DNA test on the carpet was inconclusive.

{¶ 21} Despite the lack of physical evidence, the testimony of both witnesses precludes any type of outcome determinative result in this case. Both victims testified that Jordan was in their apartment and ordered them, at gunpoint, to drive to the bank for money. *Jordan I* at ¶ 27. Both victims described how Jordan forced them to return to the apartment at which point he sexually abused V1 at gunpoint. *Id.* Both victims went on to describe how Jordan then ordered them to return to the bank for more money before he released them and fled the scene. *Id.* In the 911 recording, V1 described the events similarly to what she testified to at trial. Regarding the rape kit not linking Jordan to the sexual

abuse, Nurse Baatz testified that, when she collected physical evidence from V1's mouth, "there's a chance [she] would [have] miss[ed]" physical evidence that Jordan left in V1's mouth. *Jordan I* at ¶ 26. The victims also provided law enforcement with the license plate of the vehicle Jordan was operating on the night in question. (Vol. I Tr. at 57, 177.) Upon further investigation by law enforcement, the vehicle was registered to Rita Reynolds, Jordan's then girlfriend. (Vol. II Tr. at 239.)[4] Most importantly, both victims identified Jordan as the perpetrator at trial. V2 also identified Jordan in the initial photo array. V1 testified at trial that the lack of physical evidence was not surprising because, throughout the incident, she observed that Jordan "tried not to touch anything. If he had to touch something * * * he would * * * pull his coat to his hands and his fingers so that he doesn't leave prints. He actually said, I don't want to leave any prints behind." *Jordan I* at ¶ 5.

{¶ 22} Concerning the second scenario, we are not persuaded the trial court abused its discretion concluding that there was not a strong probability that a reasonable fact finder would have found the offender guilty of that offense. First, the probative value of a third-party's DNA evidence on these items is either questionable or not developed in the record. Concerning the toilet, the record indicates that at the time of the offenses, the victims were moving into the apartment. *Jordan I* at ¶ 4. There is no way to know the cleanliness of the toilet and whether other prior occupants had DNA on the toilet. As for the other pieces of evidence, Jordan failed to identify in the record, and we could find none, any references whether the offender used a wash mitt. While there was testimony that the offender used a hand towel at one point, it is unclear as to the cleanliness of the towel before it was thrown on the ground. Regardless, even if other DNA was found on these items, it was reasonable for the trial court to conclude that this would not amount to an outcome determinative result. In addition to the victim's testimony and identification of Jordan as the perpetrator, other evidence linked Jordan as the offender in this case. The most telling piece of evidence, outside the victim's testimony, was the identification of the vehicle driven by the offender. The victims provided law enforcement with a description of the vehicle and license plate number, which upon investigation matched the license plate of Jordan's then girlfriend,

---

[4] Jordan's brief also notes that Reynolds is the mother of his child. "But Rita Reynolds whom was no longer romantically involved with appellant at time of allegations even though she was carrying his child." (Aug. 29, 2023 Appellant's Brief at 6.)

Rita Reynolds. (Vol. III Tr. at 239.) Such evidence greatly mitigates the potential risk of mistaken identification in this case.

{¶ 23} Jordan argues the facts of this case are analogous to *State v. Emerick*, 170 Ohio App.3d 647, 2007-Ohio-1334 (2d Dist.). A brief review is instructive.

{¶ 24} In 1996, Emerick was indicted on one count of aggravated robbery and two counts of aggravated murder, with death penalty specifications, originating out of the deaths of two individuals during a robbery at the Sloopy's bar in Dayton, Ohio. *State v. Emerick*, 2nd Dist. No. 24215, 2011-Ohio-5543, ¶ 2. At trial, the state presented testimony that Emerick was outside the bar around 11:00 a.m. on the date the crimes were committed. *Id*. at ¶ 3. Other witnesses testified that Emerick, as the former manager of another bar down the street, had previously been in the office where the stolen safe was located. *Id*. There was also a handwritten letter about the crime that, according to a handwriting expert, was "extremely likely" to have come from Emerick. *Id*. Finally, there was testimony from a man in jail who claimed, among other incriminating statements, that Emerick disclosed that he wished he had taken the murder weapon with him. *Id*. While there were numerous blood samples collected from the crime scene, no DNA evidence linking Emerick to the murders was presented at trial. *Id*. at ¶ 4. Emerick was ultimately found guilty of the offenses and sentenced to life in prison. *Id*. at ¶ 5. In October 2005, Emerick filed an application for DNA testing of various items arguing that DNA testing could prove his innocence. *Id*. at ¶ 6. While the trial court overruled the application, the Second District Court of Appeals reversed finding both that Y-STR DNA analysis was not available at the time of Emerick's trial and that the test of the items would prove outcome determinative. *Id*. at ¶ 10-11.

{¶ 25} The facts of the instant case are distinct from *Emerick*. Here, two witnesses testified that Jordan was the perpetrator in this case. The victims were also able to provide a license plate of the vehicle driven by the offender, which was discovered to be registered to Jordan's then girlfriend. Conversely, in *Emerick*, there were no witnesses to the offenses. We also note that the offense in *Emerick* took place nearly ten years before the present case during a period of significant advancement in DNA analysis, which included the general acceptance of Y-STR DNA testing. Here, Y-STR analysis was generally available and accepted at the time of Jordan's trial.

{¶ 26} As to Jordan's contention that the trial court impermissibly considered the evidence, which he contends are issues reserved for a testing authority such as evidentiary value or why testing authority made certain decisions, such considerations can reasonably be attributed to the court's efforts to determine whether testing would prove outcome determinative. At the very least, we do not find the trial court's findings unreasonable under the facts of the case.

{¶ 27} Given the specific facts and circumstances of this case and the evidence presented by the state, we cannot say that the trial court abused its discretion by concluding that the DNA evidence would not have been outcome determinative, i.e., that there is a strong probability that no reasonable fact finder would have found the offender guilty of the various offenses. Because Jordan has failed to meet all the elements of R.C. 2953.74(B)(1), we need not examine the additional factors provided in R.C. 2953.73(C). *See Wilkins* at ¶ 18 ("In reading 2953.74 to 2953.81 in pari materia, we find that the trial court was not required to proceed further than 2953.74(B) since Defendant did not meet the requirements of (B)(1) or (2). If a petitioner meets the requirements of 2953.74(B)(1) or (2), then the trial court would proceed to 2953.74(C).").

{¶ 28} Accordingly, Jordan's first assignment of error is overruled.

## IV. CONCLUSION

{¶ 29} Having overruled Jordan's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and JAMISON, JJ., concur.

_____